486 So.2d 968 (1986)
Edward R. ROZELL
v.
LOUISIANA ANIMAL BREEDERS COOPERATIVE, INC., et al.
No. CA 84 1465.
Court of Appeal of Louisiana, First Circuit.
March 25, 1986.
Writ Granted May 30, 1986.
R. Bruce Macmurdo, Baton Rouge, for plaintiff-appellant, Edward R. Rozell.
James E. Moore, Baton Rouge, for third party appellee petitioner, Atlantic Breeders Co-op., Inc.
Henry D. Salassi, Jr., Baton Rouge, for third party appellee defendant, La.Animal Breeders Co-op., Inc.
Oscar L. Shoenfelt, III, and Mary Thompson, Baton Rouge, for defendant-appellant Continental Ins. Co.
Before LOTTINGER, COLE and CRAIN, JJ.
COLE, Judge.
Plaintiff, Edward Rozell, appeals from a judgment dismissing his suit for the personal injuries he sustained when attacked by a bull belonging to defendants, Atlantic Breeders Cooperative, Inc. and Louisiana *969 Animal Breeders Cooperative, Inc.[1] The issue presented by this appeal is whether plaintiff was guilty of "victim fault" or had assumed the risk of the injury he sustained so as to bar his recovery.
The trial court's findings of fact are set out in its reasons for judgment as follows:
"... On or about March 14, 1980, Mr. Rozell was an employee of the Dairy Improvement Center at L.S.U. His job consisted of handling bulls which includes feeding the bulls and keeping up the perimeters containing the bulls i.e. the fence. Normally this job is done in pairs. However at the time of this accident which was about 7:00 A.M. in the morning Mr. Rozell was feeding the bulls. To have some understanding as to the scene where this particular accident occurred, the court will make reference to plaintiff's exhibit number-1 and also supplement plaintiff's exhibit number-1 by the court's own impressions that were obtained yesterday afternoon upon visiting the area where the accident occurred. On this particular morning Mr. Rozell arrived at the particular barn housing Dixie Lee Fashion. According to plaintiff's exhibit number-1, it has note on it `door to the house.' Immediately adjacent and contiguous to that line is a road where an employee would pull up a tractor with the feed on the back. He would take the feed off the trailer attached to the tractor, walk into what I would consider the front door, describing the door to the house on P-1. He would enter into the small barn, as shown on P-1. He would turn to the right. There is a feed trough whereby the feed can be poured into the trough without even getting into the enclosure which contains the bull. Looking at P-1, facing the feed trough, it appears to the court that this enclosure, the bullpen, measures probably in the neighborhood of twenty by twenty feet. The top part of P-1 is designated `pasture.' The bull has a small run-about area, small pasture, and he comes into the bull pen through the area marked `gate'. This gate is a metal gate as reflected in the pictures. The gate is permanent up against the wall shown by `shaving bin'. This particular wall is a solid wall in which the gate, as I mentioned, is permanently attached to the wall. In looking at P-1 the gate opens inward and, normally, should be attached to the shaving bin wall in the vicinity of where the diagram shows `window opening.' The purpose behind this, obviously, is so the bull can go out and eat in the pasture or he can come into the bullpen in inclement weather or whatever he decides, of course, he wants to do. So the normal procedure is to keep the gate pinned so the bull will have access to the bullpen. In examining the hinge operation of the gate, the area to the, well, the right-hand side of the gate had two lock mechanisms, one toward the top of the gate and one toward the bottom of the gate. I can best describe those mechanisms as consisting of what appears to be a fork or a `U' with a hinge mechanism whereby the fork would lift up, the top one and the bottom one, and when you got to a metal pole then you would bring thefork back down and it would engage on both sides of the pole. Therefore the gate would be locked. Going back up to the feed trough, as one stands in front of the feed trough facing it, there is a small opening designated on *970 P-1 as `slide space' an area that is adjacent to the shaving bin wall and also a small protruding wall shown on P-1 labeled `wall' parallel to the shaving bin wall. Testimony relative to the diagram of P-1 was that it was not to scale and I can assure my learned brothers above it is not to scale, for as one enters into the slide space the wall to the right extends approximately twenty-four inches. That wall is probably in the neighborhood of thirty or forty inches wide, probably less. There's just enough room for a person to slide through and get into the bullpen, however, not wide enough for a bull to enter into the slide space. So when a person enters into the slide space there is only approximately two feet in which he is protected and the court heard testimony yesterday that from the area where you get out of the slide space protection over to the gate it was about three steps which I interrupted (sic) to be nine or ten feet, somewhere in there. I think that after viewing that area, that this is probably a good estimate. I estimated about ten feet, yesterday. Back to the feed trough, again. As a bull enters into the gate, he comes into the bullpen area and walks up to the feed trough. However, to get in the feed trough there are metal pipes extending from the wall by the feed trough back parallel with the road. What this does, it provides a feeding stall. In fact, the court estimated that once a bull was in the feed trough you probably could put poles behind the bull * * * and retain him in that area. * * * I think it is important to know that the bull entering the bull pen just can't walk up and feed in the feed trough. It has to go around these extended pipes to get into the stall. * * * Mr. Rozell was to be feeding the bulls on the morning of March 14, 1980. He testified that Dixie Lee Fashion was in the bullpen area, that he poured the feed in the feed trough and that Dixie Lee Fashion commenced eating the feed. He said that he noticed that the gate, which I have previously described that leads out into the pasture area, was open, closed, ajarred. It wasn't attached to the wall by the shaving bin and the condition of the gate was such that he did not feel that Dixie Lee Fashion could go back out into the pasture area. So he decided to pull the gate over and to hook it to the wall shown by `open window' on P-1. * * * Actually it's an open space. There's not a pane window there. But a person can walk into the shaving bin, walk over to the window area and can, by reaching through and extending a part of his body through the opening, grab the gate and pull the gate up to the wall and fasten it without ever entering into the bullpen. Mr. Rozell, being employed at L.S.U. on two occasions, testimony was that he was involved in dairy science for about two years when he was fifteen or seventeen. He worked at L.S.U. at Dairy Science Services and then he left for the Department of Corrections and then he came back and as I recall his testimony he had been there for about a year or so at the time of the accident. * * * Seeing that the gate was not open, Mr. Rozell decided to slide through the slide space and walk over some ten feet * * * pull the gate to the wall, fasten it and walk out. He testified that he had been told `never turn your back to the bull and always have a helper when corraling a bull'. He was quite familiar with the propensities of the bulls. In fact, his testimony was that a man with good sense just wouldn't turn his back to a bull. But feeling that the bull was eating, that his eye level was below the feed trough, he felt that if he didn't startle the bull he could accomplish his mission by going into the bullpen. He went into the bullpen as I appreciate his testimony, he turned his back to the bull and he was hit in the back and apparently rolled over and the bull had his head on Mr. Rozell's chest. Questioned by the attorneys as to: `Well, when you got into the slide space why didn't you keep your back to the shavings bin wall, if you were going to go into the bullpen, and slide down, watching the bull, reach over and grab the gate with your left hand?', Mr. Rozell *971 said he was right-handed and thought he would need his right hand for strength. Testimony of other witnesses to the fact that various alternatives could have been: to go to the window opening, reach in and pull the gate back with your hand. That if you couldn't reach it for some unknown reason then get a wire hook that was to be found back up in the tack room some one hundred, two hundred yards, from this particular setting and use it to reach over and pull the gate, or get a rope to throw over through the open window and pull the gate. Or if you decide to go into the bullpen area, secure the bull. You do that by putting the wire in the ring in the bull's nose. You do that by haltering the bull, then go in. But the witnesses, Mr. Wooters and Mr. Gantt, testified that you would never go into the pen by yourself and you would never go in the pen by yourself and turn your back. Mr. Rozell stated that he felt that he could he accomplish his mission without being injured, realizing that there was a danger inasmuch as he checked the bull to make sure the bull's head was down in the feed bin and wouldn't be watching him, that he moved, apparently cautiously, because he indicated he did not want to startle the bull. I believe that those comments constitute the facts and are, of course, my findings of facts in this particular case."
Following his injury, plaintiff filed suit against defendants for personal injuries. A third-party intervention was filed by Continental Insurance Company, L.S.U.'s worker compensation insurer, seeking reimbursement of the compensation benefits it paid to plaintiff. In addition, a third-party demand was filed in these proceedings by Atlantic Breeders Cooperative, Inc. against Louisiana State University, seeking indemnification in the event plaintiff obtained a judgment against Atlantic.
Following trial of this matter, the trial court concluded on the basis of its factual findings plaintiff was guilty of contributory negligence which constituted victim fault. It accordingly dismissed plaintiff's suit, as well as Continental's third-party intervention and Atlantic's third-party demand. Appeals from this judgment have been taken by both plaintiff and Continental.
Plaintiff's primary contention on appeal is that the trial court erred in finding him guilty of contributory negligence. He further argues contributory negligence may not even be asserted as a defense in cases such as the present one since the liability of the bull's owners is absolute rather than merely strict.[2]
La.Civ.Code art. 2321 provides the owner of an animal is liable for any damages the animal has caused. In Holland v. Buckley, 305 So.2d 113 (La.1974), the Supreme Court held, at p. 119:
"... [T]he correct interpretation of Civil Code Article 2321 is as follows: When a domesticated animal harms another, the master of the animal is presumed to be at fault. The fault so provided is in the nature of strict liability, as an exception to or in addition to any ground of recovery on the basis of negligence, Article 2316. The owner may exculpate himself from such presumed fault only by showing that the harm was caused by the fault of the victim, by the fault of a third person for whom he is not responsible, or by a fortuitous event." (Emphasis ours.) (Footnote omitted.)
The court specifically noted the liability of the owner of a domesticated animal is strict rather than absolute, as it is in the case of wild animals. Id., p. 119, ftnt. 10. It is well established cattle, including bulls, belong to the class of domesticated animals, *972 having through long association with man become subject to man's use and control. Smith v. State Farm Fire & Cas. Co., 381 So.2d 913 (La.App. 3d Cir.1980); Granger v. United States Fidelity & Guaranty Co., 266 So.2d 526 (La.App. 3d Cir.1972).
Victim fault is one of the defenses recognized in Holland as being a defense to liability under La.Civ. Code art. 2321. Further, it has been held that assumption of the risk may constitute victim fault which bars recovery under art. 2321. Roberts v. Hartford Acc. & Indem. Co., 394 So.2d 696 (La.App. 3d Cir.1981); Daniel v. Cambridge Mut. Fire Ins. Co., 368 So.2d 810 (La.App. 2d Cir.1979), writ denied, 369 So.2d 1063 (La.1979); see Dufrene v. Fournier, 420 So.2d 1178 (La.App. 5th Cir.1982), writ denied, 427 So.2d 870 (La.1983). In order to assume the risk of injury, a person must knowingly and voluntarily encounter the risk which caused him injury. Leonard v. Blackburn, 468 So.2d 825 (La.App. 1st Cir.1985), writ denied, 474 So.2d 1306 (La. 1985); Daniel v. Cambridge Mut. Fire Ins. Co., supra. He must understand and appreciate the risk involved and accept it voluntarily. Id.
In the present case, plaintiff voluntarily entered a bull pen in order to open the gate leading to a pasture. Plaintiff testified he considered it part of his job to secure this gate, but admitted he did not feel any pressure to do so in order to avoid a reprimand. In fact, it was specifically against safety rules for employees to enter the bull pen alone. Plaintiff stated he was aware of this rule, but had seen co-workers disregard it on occasion. Nevertheless, plaintiff, who had been around cattle from an early age, acknowledged awareness of the fact bulls could be unpredictable and precautions were necessary in dealing with them. With respect to turning one's back on a bull, plaintiff remarked "Anyone with good sense handling a twenty-seven hundred pound animal is not going to do that." In spite of his awareness of the danger, plaintiff chose to enter the bull pen alone and walk through it with his back to the bull. We do not believe the situation presented an emergency requiring plaintiff to take such action. Further, plaintiff could have accomplished this task in a far safer manner by either going for assistance or using one of the several alternative methods listed by the trial could in its reasons for judgment.
From plaintiff's testimony it is absolutely clear he fully understood and accepted the risk involved in entering the bullpen alone. He then voluntarily left a position of complete safety outside the pen and entered the pen where he was attacked. Under the facts present, it is clear plaintiff voluntarily assumed the risk of his injury and is thus barred from recovery. See Dufrene v. Fournier, supra. Plaintiff is to bear all costs of this appeal.
AFFIRMED.
NOTES
[1] This judgment was the second rendered by the trial court in this matter. Plaintiff's suit was previously dismissed by the trial court on defendants' motions for summary judgment. The basis of these summary judgments was the fact the bull which injured plaintiff was not under the care, custody or control of its owners, defendants herein, at the time it injured plaintiff. This court affirmed these summary judgments. Rozell v. Louisiana Animal Breeders Co-op, Inc., 422 So.2d 435 (La.App. 1st Cir.1982). The Supreme Court reversed the judgment of this court, however, finding defendants could be held responsible under La.Civ. Code art. 2321 for any damages inflicted by their bull, regardless of whether it was in their custody at the time. Rozell v. Louisiana Animal Breeders Co-op, 434 So.2d 404 (La.1983). This matter was then remanded to the trial court for trial on the merits, which resulted in the judgment now complained of in this appeal.
[2] Citing Bell v. Jet Wheel Blast, Div. of Ervin Ind., 462 So.2d 166 (La.1985), plaintiff also argues comparative negligence has always been the law in this State and, accordingly, should be applied in the present case. We pretermit this issue since we believe plaintiff voluntarily and unreasonably assumed the risk of his injury. Continental has adopted each of the arguments made by plaintiff.